**Robert Joseph GRILLS, Jr., Plaintiff,**

v.

**PHILIP MORRIS USA, INC., et al., Defendants.**

Civil Action No. 2:08–CV–15–UA–DNF.

United States District Court,
M.D. Florida,
Ft. Myers Division.

Aug. 4, 2009.

Robert Joseph Grills, Jr., pro se.

Shook, Hardy & Bacon L.L.P. (C. Ryan Jones, Daniel F. Molony and Joshua R. Brown), for Defendants.

### OPINION

POGUE, District Judge [1]:

Plaintiff Robert Joseph Grills, Jr. ("Grills"), a life-long smoker, brings this action against defendants Philip Morris USA, Inc. ("Philip Morris USA"), Philip Morris Inc., Philip Morris Cos. and R.J. Reynolds Tobacco Co. (collectively, "Defendants"), alleging fraud, i.e., "fraudulent misrepresentation, concealment, and non-disclosure," in the Defendants' marketing and sales of cigarettes.

Defendant Philip Morris USA moves to dismiss Grills's Second Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), claiming that Grills's asserted cause of action has been expressly preempted, under the rule of Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) and its progeny, and further asserting that Grills's complaint fails to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).

For the reasons explained below, the DISMISSES Grills's complaint pursuant to Fed.R.Civ.P. 8 and 12(h)(3),[2] but also GRANTS Grills One final opportunity to amend his complaint. As a consequence, the court DENIES Defendant's pending motion with leave to re-file in the event Grills's next amended complaint fails to comply with the Rules.

### BACKGROUND

According to his amended complaint, Grills, a resident of Florida, began smoking at the age of 18, in 1977, when he joined the U.S. Army. Pl.'s Second Am. Compl. ¶¶ 21, 58. Grills maintains that, while in the Army, he was "subject to the defendants' illegal and fraudulent marketing techniques ...," Id. ¶ 58, and that, since starting smoking, he has smoked Marlboro, Marlboro Light and Doral cigarettes. Grills asserts that he "currently smokes and has an addiction to" Marlboro Lights. Id. ¶¶ 58, 59. As a result of smoking Defendants' products, Grills alleges, medical personnel at the Veteran's Administration of Ft. Myers, Florida have diagnosed him with Tobacco Use Disorder, asthma, chronic bronchitis and coughing, hypertension, angina-related heart problems and hoarseness, id. ¶¶ 61, 63, all of which cause him to take a number of prescription medications. Id. ¶ 62.

Defendants Philip Morris USA and Philip Morris Inc.[3] are subsidiary companies of Philip Morris Cos.[4] All three entities are Virginia corporations with their principal places of business in New York. Philip Morris USA is the domestic cigarette manufacturer for Philip Morris Cos., and manufactures, among other brands, Marlboro

---

1. Judge Donald C. Pogue of the United States Court of international Trade, sitting by designation.

2. According to Fed.R.Civ.P. 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

3. It is unclear whether Philip Morris Inc. is a separate entity from Philip Morris USA.

4. Philip Morris Cos. has changed its name to Altria Group, Inc. However, the court Will refer to it under its former name.

and Marlboro Light cigarettes. Defendant R.J. Reynolds Tobacco Co. ("R.J. Reynolds") is a New Jersey corporation with its principal place of business in Winston–Salem, North Carolina. R.J. Reynolds manufactures, among other brands, Camel and Doral cigarettes.

Grills, proceeding *pro se,* filed his Original Complaint [5] in this matter, on January 11, 2008, against Philip Morris USA and Reynolds America Inc. ("RAI").[6][7] RAI filed a May 19, 2008, motion to dismiss for lack of personal jurisdiction and an August 14 motion to dismiss for lack of prosecution and failure to comply with court orders. Philip Morris USA, likewise, moved the court, on May 30, 2008, to dismiss the complaint; unlike RAI's motion, however, Philip Morris USA sought dismissal for failure to state a claim.

Judge Frazier denied RAI's motion to dismiss for lack of prosecution. District Judge Lazzara denied RAI's other motion, but granted Philip Morris USA's motion, affording Grills "one opportunity to file an amended complaint which states a cause of action." *Grills v. Philip Morris USA,* No. 2:08–CV–15–UA–DNF 3 (M.D.Fla. Oct. 22, 2008) (order dismissing complaint for failure to state a claim but denying motion, without prejudice, to dismiss case for want of personal jurisdiction).

Grills filed his First Amended Complaint [8] against the same defendants on November 5. RAI re-moved to dismiss the case for lack of jurisdiction, and Philip Morris USA re-moved to dismiss for failure to state a claim. On November 21, Judge Lazzara again granted Philip Morris USA's motion, finding Grills' First Amended Complaint "woefully deficient." *Grills v. Philip Morris USA,* NO. 2:08–CV–15–UA–DNF 1 (M.D.Fla. Nov. 21, 2008) (order dismissing complaint for failure to state a claim but denying motion, without prejudice, to dismiss case for want of personal jurisdiction). Judge Lazzara further stated:

> Out of an abundance of caution, however, and in recognition of Plaintiff's *pro se* status, the Court will afford him one more opportunity to file a complaint which conforms to the requirements of the Federal Rules of Civil Procedure and establishes this Court's jurisdiction over Defendant Reynolds America, Inc. Plaintiff is placed on notice that this will be his last opportunity to file a complaint and should his next complaint be

5. This complaint, one page in length, pled:

 The Defendants produced and sold a product that caused long term chronic health problems to me. [ ] The Defendants added chemicals which they should have known were dangerous. The products caused me to have permanent damage to my health....

 Pl.'s Compl. ¶¶ 4–5.

6. RAI is the parent holding company for R.J. Reynolds, organized under the laws of North Carolina with its principal place of business in Winston–Salem, North Carolina.

7. Grills moved, on March 1st, for leave to add the U.S. Army as a defendant; this motion was granted by U.S. Magistrate Judge Frazier, however Grills did not file an amended complaint in the time allotted by the court, and it does not appear that Grills has subsequently named the Army as a defendant in this case.

8. The First Amended Complaint, one page in length, pled the following:

 The defendants sold [dangerous tobacco products] in the State of Fl[orida] even after research around the world had proven these products caused many health problems. I have C.O.P.D. because of the damage from these dangerous [p]roducts. Proof of the association between these products and health problems is already in the Federal courts['] records from previous cases.

 Pl.'s First Am. Compl. 1.

found legally insufficient, the Court will dismiss this case with prejudice.

*Id.* 1–2. Thus, the court again denied RAI's motion. *Id.* 2.

Grills filed his 29–page Second Amended Complaint, on December 29, 2008, now naming four defendants, i.e., Philip Morris USA, Philip Morris Inc., Philip Morris Cos. and R.J. Reynolds.[9] In his Second Amended Complaint, Grills alleges fraud, fraudulent misrepresentation, fraudulent concealment, nondisclosure[10] and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, on the part Of Defendants, and requests $1 million in compensatory damages as well as $1 million in punitive damages.

On January 12, 2009, Defendant Philip Morris USA filed the motion that is currently before the court, arguing that Grills's asserted cause of action has been expressly preempted under the rule of *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) and its progeny, and that Grills's Second Amended Complaint fails to plead fraud with "particularity" as required by Federal Rule of Civil Procedure 9(b). Philip Morris USA also moved to dismiss Grills's RICO claims, which Grills has voluntarily abrogated.

## DISCUSSION

The court will address each of Philip Morris USA's contentions regarding Rule 9(b) and federal preemption.[11] Because Grills's Second Amended Complain could possibly be saved by truthful amendment, the court will grant Grills one last opportunity to amend his complaint. Before turning to the motion to dismiss, however, the court must first discuss its subject matter jurisdiction.

## I. Subject Matter Jurisdiction

■ Defendant Philip Morris USA has not challenged the court's jurisdiction; nonetheless, the court is "obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking." *Cadet v. Bulger*, 377 F.3d 1173, 1179 (11th Cir.2004) (internal quotations and citation omitted) (italics added).

To provide jurisdiction, in his Second Amended Complaint, Grills asserts that his complaint raises a federal question, under 28 U.S.C. § 1331, because he asserts a RICO claim.[12] Grills also asserts that the court has supplemental jurisdiction, under 28 U.S.C. § 1367, over his remaining common-law fraud claims. But Grills has dismissed any RICO claim; it follows that Grills has now dismissed all federal claims against Defendants and therefore may no

---

**9.** RAI was not named as a defendant, and therefore is no longer a party to this case. *See* Fed.R.Civ.P. 10.

**10.** Although nondisclosure is an element of fraud, *see Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849, 855 n. 7 (11th Cir.1997), there does not appear to be a separate action for "nondisclosure" under Florida state law in this particular context. However, "fraudulent nondisclosure" and fraudulent concealment are "interchangeable names for the same cause of action." *Solorzano v. First Union Mortgage Corp.*, 896 So.2d 847, 848 n. 1 (Fla.Dist.Ct.App.2005). While still reading Grills's complaint broadly, as he is a *pro se*

plaintiff, *see McQueen v. Tabah*, 839 F.2d 1525, 1529 (11th Cir.1988), the court reads Grills's nondisclosure claim as duplicative of his fraudulent concealment claim.

**11.** As is explained below, the court also concludes that it lacks jurisdiction to hear Grills's complaint as currently stated.

**12.** Federal Rule of Civil Procedure 8(a)(1) requires that, to be adequate, a complaint must contain "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support."

longer claim federal question jurisdiction under 28 U.S.C. § 1331.

The court notes, however, that all entities in this action appear to be citizens of the United States, and that the court may have federal diversity jurisdiction, in accordance with 28 U.S.C. § 1332, over actions involving "citizens of different states"[13] where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."[14]

■ "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). Grills has sufficiently alleged that Defendants are citizens of New Jersey, New York, North Carolina and Virginia. However, although complete diversity could exist in this case, Grills fails to sufficiently allege his own citizenship in Florida.[15] He alleges his "mailing address" in Fort Myers, Florida, *see* Pl.'s Second Am. Compl. ¶ 9; however, allegations of residency, much less a "mailing address," are insufficient to plead Grills's citizenship of the state of Florida. *See Beavers v. A.O. Smith Elec. Prods. Co.,* 265 Fed.Appx. 772, 777 (11th Cir.2008) (per curiam) ("Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person.") (quoting *Taylor v. Appleton,* 30 F.3d 1365, 1367 (11th Cir.1994)); *Strain v. Harrelson Rubber Co.,* 742 F.2d 888, 889

(5th Cir.1984) (per curiam); *see also Toms v. Country Quality Meats, Inc.,* 610 F.2d 313, 316 (5th Cir.1980) ("when jurisdiction depends on citizenship, citizenship should be 'distinctly and affirmatively alleged.'") (quoting 2A James Wm. Moore et al., *Moore's Federal Practice* § 8.10 at 1662 (2d ed. 1976); *McGovern v. Am. Airlines, Inc.,* 511 F.2d 653, 654 (5th Cir.1975)). Thus, to comply with Rule 8 and correctly invoke this court's diversity jurisdiction, Grills must affirmatively plead section 1332 as well as allege his citizenship in Florida. Failure to correctly invoke jurisdiction results in dismissal pursuant to Fed.R.Civ.P. 12(h)(3). *See Parra v. Sec'y, Dep't of Homeland Sec.,* No. 6:08–cv–437–Orl–19GJK, 2009 WL 528622, at *2–3, 2009 U.S. Dist. LEXIS 20766, at *7 (M.D.Fla. Mar. 2, 2009) (citing *Leisure v. Hogan,* 21 Fed.Appx. 277, 278 (6th Cir.2001); *Anderson v. United States,* 245 F.Supp.2d 1217, 1221 (M.D.Fla.2002)); *see also Seagraves v. Harris,* 629 F.2d 385, 389 (5th Cir.1980).

■ In this situation, however, Grills's pleading imperfection does not require final dismissal of his complaint with prejudice. According to 28 U.S.C. § 1653, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." *See also Newman–Green,* 490 U.S. at 830, 109 S.Ct. 2218. "[L]eave to amend pleadings shall be freely given when justice so requires." *Capital Asset Research Corp. v. Finnegan,* 216 F.3d 1268, 1270 (11th Cir.2000) (per cu-

---

**13.** Section 1332 provides that a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c).

**14.** As Grills demands at least $75,000 in damages, he potentially meets the monetary requirement as well.

**15.** For an individual, "[i]n order to be a citizen of a State within the meaning of the

diversity statute, a natural person must both be a citizen of the United States *and* be domiciled within the State." *Newman–Green,* 490 U.S. at 828, 109 S.Ct. 2218 (emphasis in original). "A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom." *Sunseri v. Macro Cellular Partners,* 412 F.3d 1247, 1249 (11th Cir.2005) (citation and quotation marks omitted).

riam). Further, "leave to amend should be freely granted when necessary to cure a failure to allege jurisdiction properly." *Majd–Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 n. 1 (11th Cir.1984) (citing *Miller v. Stanmore*, 636 F.2d 986, 990 (5th Cir.1981); *Seagraves*, 629 F.2d at 390; 3 Moore *et al., supra*, ¶ 15.09); *see also Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir.1997) ("Such amendments [to cure defective allegations of jurisdiction] will be freely permitted where necessary to avoid dismissal on purely technical grounds" unless "the record clearly indicates that the complaint could not be saved by any truthful amendment . . . .").

Thus, the court should allow Grills to amend his complaint to allege federal diversity jurisdiction unless the complaint cannot be saved by a truthful amendment. In order to determine whether it is possible that the complaint can be saved, the court must consider the inadequacies identified by the Defendants.

## II. Preemption

As noted above, Grills's complaint challenges Defendants' marketing and advertising of their cigarettes. If Grills' complaint alleged *only* that Defendants' marketing and advertising of their cigarettes contained inadequate warnings of smoking's negative health effects, the complaint would be preempted by the federal regulatory regime for cigarette advertising. Grills's complaint, however, attempts to allege that Defendants' activities involved actual fraud. To the extent that Grills can successfully plead such a cause of action, it would not be preempted.

### A. *Cipollone* Federal Preemption

■■■ Under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2,[16] "state law that conflicts with federal law is 'without effect,'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), i.e., it is preempted. At the same time, federal law does not displace all state regulation. Rather, the "historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.* (citation omitted). In deferring to state police power, a court Will construe federal laws narrowly to avoid unintended preemption. *Id.* at 518, 112 S.Ct. 2608.

Specifically with regard to the federal regulation of smoking, under the rule of *Cipollone* and its progeny, the federal regulation of cigarette labeling and advertising does preempt some state claims. That federal regulatory regime began following a 1964 conclusion of the Surgeon General's Advisory Committee that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant *appropriate remedial action,*" U.S. Department of Health, Education, and Welfare, U.S. Surgeon General's Advisory Committee, *Smoking and Health* 33 (1964), and regulations issued by the Federal Trade Commission regarding unfair or deceptive advertising by cigarette companies, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8324–74 (July 2, 1964). Congress, in 1965, passed the Federal Cigarette Labeling and Advertising Act

---

**16.** "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

("FCLAA").[17] When the FCLAA terminated by its own terms, Congress further enacted the Public Health Cigarette Smoking Act of 1969 ("PHCSA"), which amended the 1965 Act to ban cigarette advertising in "any medium of electronic communication subject to [FCC] jurisdiction," *Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608, and, in addition, replaced section 5(b) with the following preemption provision:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any Cigarettes the packages of which are labeled in conformity with the provisions of this [Act].

15 U.S.C. § 1334(b). The new section 5(b) was enacted "to avoid the chaos created by the multiplicity of conflicting regulations." S.Rep. No. 91–566 (1969), *reprinted in* 1970 U.S.C.C.A.N. 2652, 2663.

In addition, Congress provided:

> [i]t is ... the purpose of this chapter, to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—
>
> (1) the public may be adequately informed about any adverse health effects of cigarette smoking by inclusion of warning notices on each package of cigarettes and in each advertisement of cigarettes; and
>
> (2) Commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331.

Considering the scope of the PHCSA, in *Cipollone,* a plurality of the Supreme Court held that the PHCSA preempts those state law damages actions relating to smoking and health that challenge the adequacy of the warning on cigarette packages, such as claims that the manufacturers "post–1969 advertising or promotions should have included additional, or more clearly stated, warnings," and accordingly preempted the plaintiff's failure to warn claims. *Cipollone,* 505 U.S. at 524, 112 S.Ct. 2608.

In *Cipollone,* the Supreme Court considered whether the PHCSA's ban on regulating advertising preempted state common law actions for breach of express warranty, failure to warn, fraudulent misrepresentation and conspiracy against defendant cigarette manufacturers. *Id.* at 509, 112 S.Ct. 2608.

Justice Stevens's plurality[18] opinion analyzed the PHCSA under the rubric of ex-

---

**17.** The 1965 Act, among other things, "mandated warnings on cigarette packages (§ 5(a)), but barred the requirement of such warnings in cigarette advertising (§ 5(b))." *Cipollone,* 505 U.S. at 514, 112 S.Ct. 2608 (citing Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89–92, 79 Stat. 282 (1965)). "However, § 5(c) of the Act expressly preserved 'the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes.'" *Id.* at n. 9 (quoting 79 Stat. 283).

**18.** Justice Stevens's conclusion, that the FCLAA did not preempt common law causes of action for damages, obtained a clear majority; it was joined by Justices Rehnquist, White, Blackmun, O'Connor, Kennedy and Souter. At the same time, Justice Stevens's conclusion that only failure to warn claims were preempted by the PHCSA, and that other common law damages actions survived 1969, was joined by Justices Rehnquist, White and O'Connor, and, in the failure to warn preemption holding only, by Justices Scalia and Thomas, the latter which would have held all state common law damage actions

press preemption, because, although Congressional intent could also be "implicitly contained in [the Act's] structure and purpose," section 5 set forth an express preemption provision. *Id.* at 516, 517, 112 S.Ct. 2608. In light of section 5, Justice Stevens, for the plurality, asked whether "the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under state law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." *Id.* at 524, 112 S.Ct. 2608. The court decided that failure to warn claims did constitute such a requirement or prohibition and were therefore preempted. *Id.*

However, the plurality permitted the plaintiff's other causes of action, including the fraudulent misrepresentation and fraudulent concealment claims, noting that fraud claims were based not on "a duty based on smoking and health" but on "the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608; *see also Altria Group,* 129 S.Ct. at 545–47. This approach recognized that Congress narrowly phrased section 5(b) so as not to preempt state police power. *See id.* at 529, 112 S.Ct. 2608; S.Rep. No. 91–566 (1969), *reprinted in* 1970 U.S.C.C.A.N. 2652, 2663. The plurality also reasoned that Congress did not

intend to "insulate cigarette manufacturers from long-standing rules governing fraud." *Cipollone,* 505 U.S. at 529, 112 S.Ct. 2608. Whereas state failure to warn claims would result in inconsistent cigarette labeling regulations, fraud claims do not create "diverse, nonuniform, and confusing" standards that would conflict with Congress's goal of uniformity of requirements for cigarette labeling and/or advertising. *Id.*

This Circuit, following *Cipollone,* subsequently has concluded that "a manufacturer's duty to warn is in essence a duty to warn through advertising and promotion" and therefore is preempted. *Spain v. Brown & Williamson Tobacco Corp.,* 363 F.3d 1183, 1197 (11th Cir.2004) (upholding the Alabama Supreme Court's recognition that a "such a claim in essence alleges that the defendants breached their state duty to warn through advertising and promotion, and therefore are preempted by the federal Labeling Act"). However, the Circuit has not further delineated the scope of the PHCSA's preemption pre- or post-*Cipollone,* although, along with a majority of circuit courts,[19] the Circuit has consistently upheld *Cipollone*'s preemption analysis. *Spain,* 363 F.3d at 1192 (stating that the Eleventh Circuit joins other courts who have "treated the plurality opinion in *Cipollone* as if it were a majority opinion"); *see also Peel v. R.J.*

---

preempted. Thus, Justice Stevens's analysis, differentiating between failure to warn claims and other state law claims, garnered only four votes—accordingly, *Cipollone* is referred to as a plurality opinion. However, much of Justice Stevens's analysis obtained majority support in his recent majority opinion in *Altria Group, Inc. v. Good,* —— U.S. ——, ——, 129 S.Ct. 538, 546–47, 549, 172 L.Ed.2d 398 (2008).

**19.** *See, e.g., Brown v. Brown & Williamson Tobacco Corp.,* 479 F.3d 383, 393 (5th Cir. 2007); *Good v. Altria Group, Inc.,* 501 F.3d 29, 36 (1st Cir.2007); *Rivera v. Philip Morris,* 395 F.3d 1142, 1147–50 (9th Cir.2005); *Jeter*

*v. Brown & Williamson Tobacco Corp.,* 113 Fed.Appx. 465, 467 (3d Cir.2004); *Glassner v. R.J. Reynolds Tobacco Co.,* 223 F.3d 343, 348–49 (6th Cir.2000); *Aldana v. R.J. Reynolds Tobacco Co.,* No. 2:06–3366–CWH, 2007 WL 3020497, at *3–4, 2007 U.S. Dist. LEXIS 76050, at *9–11 (D.S.C. Oct. 12, 2007); *Espinosa v. Philip Morris USA, Inc.,* 500 F.Supp.2d 979, 983–84 (N.D.Ill.2007); *Clinton v. Brown & Williamson Holdings, Inc.,* 498 F.Supp.2d 639, 650–52 (S.D.N.Y.2007); *Griesenbeck v. Am. Tobacco Co.,* 897 F.Supp. 815, 823 (D.N.J.1995); *Burton v. R.J. Reynolds Tobacco Co.,* 884 F.Supp. 1515, 1519–21 (D.Kan.1995), *aff'd in part and rev'd in part on other grounds,* 397 F.3d 906 (2005).

*Reynolds Tobacco Co.*, No. 1:98–CV–2426–TWT, 1999 WL 34824790, at *4, 1999 U.S. Dist. LEXIS 22691, at *11 (N.D.Ga. Apr. 29, 1999) (noting that "the Court is bound to follow the plurality opinion of the Supreme Court in *Cipollone* ").

Although not a case under the PHCSA or FCLAA, the Circuit followed its *Spain* adoption of the *Cipollone* plurality preemption analysis in *Papas v. Upjohn Co.*, 985 F.2d 516, 517–19 (11th Cir.1993) (per curiam) (holding that the Federal Statute FIFRA (Federal Insecticide, Fungicide, and Rodenticide Act) expressly preempts common law claims). Thus, in light of both *Papas* and *Spain*, the Circuit's preemption analysis, consistent with *Cipollone*, defers to Congressional aims and applies a presumption against preemption.[20]

Furthermore, the *Cipollone* preemption analysis of the PHCSA has now been specifically ratified by the Supreme Court's 2008 decision in *Altria Group*, 129 S.Ct. at 549. The court accordingly looks to *Cipollone* and its progeny, as followed by the Circuit in *Spain* and *Papas*, to analyze the instant motion before it.

### B. Grills's Nondisclosure/Fraudulent Concealment Claims

Following the *Cipollone* and *Altria Group* preemption analysis, the court must determine whether Grills's claims are based on a breach of a duty to adequately warn of the dangers associated with Defendants' products after 1969. *See Spain*, 363 F.3d at 1196–97; *Papas*, 985 F.2d at 517–19. Again, in so doing, the court bears in mind Grills's *pro se* status and reads his complaint broadly. *See McQueen v. Tabah*, 839 F.2d 1525, 1529 (11th Cir.1988).

■ Here, as in *Cipollone*, Grills partly alleges that manufacturer's did not "provide adequate warnings of the health consequences Of cigarette smoking." 505 U.S. at 524, 112 S.Ct. 2608 (citation and internal quotation marks omitted). For example, Grills insists that the Defendants had "superior access to information about the health effects of cigarettes, nicotine and addiction," Pl.'s Second Am. Compl. ¶ 54, and yet "members of the public did not fully appreciate the health effects and addictive nature of cigarettes" and

the average consumer has not been fully aware of the addictive properties of nicotine, and most beginning smokers—particularly children and young adults—either were unaware of the addictiveness of nicotine or falsely believe that they will be able to quit after smoking for a few years arid thereby avoid the diseases caused by smoking.

---

**20.** As a result, district courts within the Circuit have followed suit, and construed the "relating to smoking and health" language of section 5(b) narrowly by looking to each of a plaintiff's common law claims to determine whether it is preempted, generally by preempting failure to warn and warning neutralization claims (which result in deviations from the PHCSA) but not fraud claims, as they retain state police powers to identify and punish deceptive advertising practices. *See, e.g., Sonnenreich v. Philip Morris Inc.*, 929 F.Supp. 416, 419 (S.D.Fla.1996) (holding that "any attempt by Defendants to notify its customers of the dangers of smoking would employ the same techniques as a traditional advertising or promotional campaign, which is preempted post 1969"); *Shepard v. Philip Morris Inc.*, No. 96–1720–CIV–T–26B, 1998 WL 34064515, at *1–3, 1998 U.S. Dist. LEXIS 23410, at *2–10 (M.D.Fla. Apr. 28, 1998) (distinguishing between a claim based on failure to warn and a claim based on fraudulent concealment, which requires an intent to defraud or deceive); *Wolpin v. Philip Morris, Inc.*, 974 F.Supp. 1465, 1469 (S.D.Fla.1997) (construing the PHCSA narrowly in holding that the PHCSA "cannot be construed to preempt state regulation of second-hand smoke when the Act was never intended to address the problem of second-hand smoke").

*Id.* ¶¶ 28, 30. Grills also appears to challenge some of Defendants' marketing and advertising techniques, including Defendants' attempts to "attract[ ] new smokers and children." *Id.* ¶ 48. *See Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 546–52, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (holding that the PHCSA preempts state limits on advertising to minors). In part, therefore, Grills appears to fault manufacturers for generally failing to disclose the health risks of smoking and the addictive properties of nicotine to consumers. This claim does not sound in fraud, and, instead, is more properly categorized as a failure to warn or warning neutralization claim. In line with *Cipollone* and *Altria Group,* to the extent that Grills is seeking additional, or more clearly stated warnings, this claim is preempted.

██ Nevertheless, much, if not most, of Grills's fraudulent concealment claim survives preemption. His claim is similar to the *Cipollone* plaintiff's fraud claim, the latter of which alleged "false representation of a material fact [and] conceal[ment of] a material fact." 505 U.S. at 528, 112 S.Ct. 2608. Grills alleges that Philip Morris USA and R.J. Reynolds "intentionally or recklessly failed to disclose or deliberately concealed [ ] material facts from the public ..., government agencies, smokers and under age youths," or "made [ ] statements recklessly with conscious disregard for the truth or falsity of their representations to the public." Pl.'s Second Am. Compl. ¶¶ 53–54. More specifically, Grills alleges that the Defendants marketed their products to children, knew that cigarettes were hazardous to its consumers' health, knew that nicotine is highly addictive and manipulated the nicotine levels in their products to enhance addiction. Grills further alleges that Defendants lied about or fraudulently concealed the above information from the public, legislative and administrative regulatory bodies and judicial proceedings. In this sense, the majority

of Grills's complaint resembles *Cipollone* and *Altria Group,* in that it involves a claim "based on allegedly false statements of material fact made in advertisements" and other communications, *Cipollone,* 505 U.S. at 528, 112 S.Ct. 2608, and based on false or "misleading" statements which "induced [Grills] to purchase [Defendants'] product." *Altria Group,* 129 S.Ct. at 546. Thus, Grills's claim relies "not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." *Cipollone,* 505 U.S. at 528–29, 112 S.Ct. 2608; *see Altria Group,* 129 S.Ct. at 545–46; *see also Shepard,* 1998 WL 34064515, at *2–4, 1998 U.S. Dist. LEXIS 23410, at *6–10 (holding that "[u]nlike a claim for failure to warn, fraudulent concealment requires a showing of intent to defraud or deceive.... [Where the Plaintiff alleged that the] Defendant intentionally concealed known information about the dangerous and addictive qualities of their product in order to induce the sale of their product [the claim was] sufficient to invoke the duty not to deceive and avoid preemption by the Act.").

Philip Morris USA argues for broad PHCSA section 5(b) preemption, claiming that the PHCSA is "necessary and sufficient" and "adequate to inform the public of the health risks associated with smoking as a matter of law." Def.'s Mot. 7–8 (citing *Altria Group,* 129 S.Ct. at 544; *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 489 n. 9, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). Defendant argues that "[r]egardless of the label attached to" Grills's claims, Def.'s Mot. 11 (quoting *Lacey v. Lorillard Tobacco Co.,* 956 F.Supp. 956, 963 (N.D.Ala. 1997)), his fraudulent concealment/nondisclosure claims are completely preempted as they involve "claims that the Defendants should have provided additional information regarding the health risks associated with smoking." *Id.* 10–11; *see also Laschke v. Brown & Williamson Tobacco*

*Corp.,* 766 So.2d 1076, 1078 (Fla.Dist.Ct. App.2000).

However, the court is unpersuaded, especially in light of the Supreme Court's recent *Altria Group* decision which reaffirmed the *Cipollone* plurality opinion— this time with majority support. *See Altria Group,* 129 S.Ct. at 549. First, the Supreme Court again emphasized a state's ability to "prohibit deceptive statements" including even such statements *"in cigarette advertising." Id.* at 544 (emphasis added); *see also Cipollone,* 505 U.S. at 528, 112 S.Ct. 2608 ("petitioner's fraudulent-misrepresentation claims that *do arise* with respect to advertising and promotions ... are not preempted by § 5(b)") (emphasis added); *Good v. Altria Group, Inc.,* 501 F.3d 29, 39–40 & n. 13 (1st Cir.2007) (collecting cases), *aff'd,* —— U.S. ——, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008).

Second, the court rejected analyses of other courts, including the Fifth Circuit, that expanded PHCSA preemption to fraud claims and held preempted aspects of fraud claims based upon a defendant's deception that "could easily be corrected by requiring additional warning on [cigarette] packages .... [making] the gravamen of Plaintiff's ... claim ... that the warnings mandated by Congress are inadequate ...." *Brown v. Brown & Williamson Tobacco Corp.,* 479 F.3d 383, 393 (5th Cir.2007) (quoting *In re Tobacco Cases II,* No. JCCP 4042, 2004 WL 2445337, at *21 (Cal.Super.Ct. Aug. 4, 2004), *superseded on other grounds, In re Tobacco Cases II,* 41 Cal.4th 1257, 63 Cal.Rptr.3d 418, 163 P.3d 106 (2007)); *see id.* at 393–95 (holding

that "any state law claim[, including a claim for fraudulent concealment,] that would *require* additional communication between companies and consumers is preempted by the Labeling Act." (emphasis added)). *See Altria Group,* 129 S.Ct. at 542, 546 (rejecting *Brown* ). The Supreme Court's holding comports with the axiom that the court begins with the "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," and, accordingly, "courts ordinarily accept the reading that disfavors pre-emption." *Altria Group,* 129 S.Ct. at 543 (citations and internal quotation marks omitted); *see also Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449–50, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005); *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240.

▮▮▮ Third, Philip Morris USA's position also conflicts with Florida law.[21] Grills's fraudulent concealment claim extends to actions taken by Defendants *other* than advertising and promotion. In Florida, fraudulent concealment claims and fraudulent misrepresentation claims are identical, and, as such, both involve elements of knowing deception and an intent to deceive. *See Irwin v. Miami–Dade County Pub. Schs.,* No. 06–23029–CIV–COOKE/BANDSTRA, 2009 WL 497652, at *7, 2009 U.S. Dist. LEXIS 14726, at *24 (S.D.Fla. Feb. 25, 2009) (citing *Greenberg v. Miami Children's Hosp. Research Inst., Inc.,* 264 F.Supp.2d 1064, 1073 (S.D.Fla. 2003); *Coral Gables Distrib., Inc. v. Milich,* 992 So.2d 302, 303 (Fla.Dist.Ct.App.

---

**21.** Although the court is "not bound by a state court's interpretation of federal law regardless of whether [the court's] jurisdiction is based on diversity of citizenship or a federal question," *Grantham v. Avondale Indus.,* 964 F.2d 471, 473 (5th Cir.1992), the Florida Supreme Court's delineation of the scope of the state's fraud causes of action is not without effect here. *See Erie R.R. v. Tompkins,* 304

U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. And whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern.").

2008)); *see also Shepard,* 1998 WL 34064515, at *3, 1998 U.S. Dist. LEXIS 23410, at *9 ("A claim of fraudulent concealment is distinct from an action for failure to warn. Unlike a claim for failure to warn, fraudulent concealment requires a showing of intent to defraud or deceive"); *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1149–50 (9th Cir.2005); *Izzarelli v. R.J. Reynolds Tobacco Co.,* 117 F.Supp.2d 167, 174–76 (D.Conn.2000). Although Philip Morris USA references *Laschke,*[22] that case relied upon another Florida District Court of Appeals decision, *Brown & Williamson Tobacco Corp. v. Carter,* 723 So.2d 833, 836–37 (Fla.Dist.Ct.App.1998) (per curiam). Notably, on appeal in *Carter,* the Florida Supreme Court criticized the lower court's treatment of this issue:

> The Carters argued ... that, according to the language of *Cipollone* itself, the 1969 Act does not preempt their claims that rely solely on ATC's "testing or research practices or other action unrelated to advertising or promotion." The Carters also attached a number of so-called advocacy statements of the cigarette industry to its motion [and witness statements demonstrating] that "in numerous instances, major cigarette manufacturers conducted public relations campaigns, including but not limited to purchasing newspaper space for making public statements [and] issuing press releases." ...
>
> In reversing the trial court on this issue, the district court [cited *Griesenbeck v. Am. Tobacco Co.,* 897 F.Supp.

815 (D.N.J.1995) for the proposition that "in the context of the labeling act, 'advertising or promotion' encompasses all forms of communication directed to a mass market."]

We, however, are not persuaded that the *Griesenbeck* court's broad interpretation of the terms "advertising or promotion" is necessarily correct. Certainly, the plain language of the *Cipollone* opinion itself demonstrates that the Supreme Court envisioned that there were other forms of communication unrelated to advertising or promotion. *See, e.g., Philip Morris Inc. v. Harshbarger,* 122 F.3d 58 (1st Cir.1997) (holding that Massachusetts statute requiring manufacturers of tobacco products to disclose additives and nicotine-yield ratings for their products to a state agency did not violate the 1969 Act, as such communication did not amount to advertising or promotion).

*Carter v. Brown & Williamson Tobacco Corp.,* 778 So.2d 932, 940–41 (Fla.2000) (citations omitted). Thus, *Carter* recognized that a plaintiff may fault a defendant for fraudulent concealment of material facts in communications other than advertising and promotion covered by the PHCSA, e.g., public relations campaigns, press releases and statements to administrative agencies. *Compare Spain,* 363 F.3d at 1200 (preempting Alabama fraudulent suppression claims, relying upon Alabama law pursuant to *Cantley v. Lorillard Tobacco Co.,* 681 So.2d 1057, 1061 (Ala. 1996)[23]); *Lacey,* 956 F.Supp. at 963 (rely-

---

**22.** *Laschke,* 766 So.2d at 1078 (holding that "the Laschkes' claim for conspiracy to commit fraud through concealment, which attempts to allege a duty beyond that imposed by the Labeling Act, is also preempted for acts occurring after 1969"); *see also Sonnenreich v. Philip Morris Inc.,* 929 F.Supp. 416, 419 (S.D.Fla.1996) (holding that "[a]ny attempt by Defendants to notify its customers of the dangers of smoking would employ the same techniques as a traditional advertising or pro-

motional campaign," which is preempted post 1969).

**23.** *Cantley* reasoned that the plaintiff's fraudulent suppression claim merely alleged generally that the defendants had failed to inform [the deceased] of the risks of smoking. Because manufacturers in the position of the defendants R.J. Reynolds and Lorillard can ordinarily communicate directly with consumers like [the deceased]

ing on *Cantley* in preempting an Alabama fraudulent suppression claim). As such, the court does not find *Laschke* determinative here.

It follows that, while some of Grills's fraudulent concealment/nondisclosure claim may be preempted, Grills's claim of actual fraud is not.

## III. Federal Rule 9(b)

While *Cipollone* permits Grills to bring fraud actions against the Defendants, Grills's Complaint fails to provide detailed allegations of fraudulent behavior, on the parts of *named* Defendants, and of how this behavior specifically affected Grills *himself.* Accordingly, as currently plead, Grills's complaint does not provide sufficient particular allegations of such fraud as required by Rule 9(b).

 In a diversity fraud action, the Federal Rules require a complaint to "state[ ] with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b); *see Whitehurst v. Wal–Mart*, 306 Fed.Appx. 446, 449 (11th Cir. 2008) (per curiam) (citing *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027–28 & n. 1 (11th Cir.2003) (per curiam)).[24] The Rule 9(b) particularity requirement dictates that the complaint must set forth

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and person responsible for

making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Rogers v. Nacchio*, 241 Fed.Appx. 602, 608 (11th Cir.2007) (per curiam) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001)). A plaintiff "need not prove [his] allegations in the complaint but must provide particular facts so the Court is not 'left wondering whether a plaintiff has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit.' " *Mitchell v. Beverly Enters.*, 248 Fed.Appx. 73, 75 (11th Cir.2007) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1313 & n. 23 (11th Cir.2002)). Failure to meet Rule 9(b)'s standards results in dismissal of the complaint. *Clausen*, 290 F.3d at 1310.

 The court is sympathetic to the fact that Grills is proceeding *pro se.* However, while "[*p* ]*ro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and are therefore liberally construed," *Whitehurst*, 306 Fed. Appx. at 447 n. 2 (citing *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir.1998) (per curiam)), a defendant's *pro se* status in civil litigation "generally will not excuse mistakes he makes regarding procedural rules." *Mickens*, 181 Fed. Appx. at 875 (citing *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980,

---

only through "advertising or promotion" channels of communication, we must conclude that Cantley's fraudulent suppression claims, as pleaded, are inevitably based upon a "state law duty to disclose ... facts through ... advertising or promotion" channels of communication and, therefore, that they [are] preempted. The trial judge properly entered summary judgments against Cantley's fraudulent suppression claims.

*Cantley,* 681 So.2d at 1061.

**24.** Florida state law also requires a complaint to plead fraud "with particularity." *See Thompson v. Bank of N.Y.*, 862 So.2d 768, 771 (Fla.Dist.Ct.App.2003) (per curiam) (explaining *Cady v. Chevy Chase Sav. & Loan, Inc.*, 528 So.2d 136, 138 (Fla.Dist.Ct.App.1988) (per curiam)).

124 L.Ed.2d 21 (1993) (explaining that we "have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel")); *see also Whitehurst*, 306 Fed.Appx. at 449 (applying Rule 9(b) despite plaintiff's *pro se* status); *Barrett v. Scutieri*, 281 Fed.Appx. 952, 954–55 (11th Cir.2008) (per curiam) (same). Thus, Grills's complaint must comply with Rule 9(b).[25]

Grills, in asserting causes of action for fraud, fraudulent misrepresentation and fraudulent concealment, makes four basic allegations in his complaint: (1) Defendants illegally marketed their products to Children and fraudulently misrepresented and concealed this fact; (2) Defendants knew that cigarettes were hazardous to its consumers' health but fraudulently misrepresented and concealed this fact; (3) Defendants knew that nicotine is highly addictive but fraudulently misrepresented and concealed this fact; and, finally, (4) Defendants manipulated the nicotine levels in their products to enhance addiction and fraudulently misrepresented and concealed this fact. As a result of these actions, Grills claims, the court should award him $1 million in compensatory damages, accounting for the amount Defendants were "unjustly enriched" by his purchase of their products as well as the negative health effects of cigarettes that he has suffered as a result of his addiction to nicotine and smoking of cigarettes. Grills also requests $1 million in punitive damages.

In evaluating the adequacy of Grills's allegations, for purposes of considering the defendant's motion to dismiss, the court construes all factual allegations in the complaint in favor of the plaintiff. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir.2005) (per curiam). Applying this construction, the court must then determine whether Grills's allegations, separately or together, sufficiently state a claim for fraud.

■ To state a claim, Grills's allegations must address each of the elements of that claim. Causes of action for fraud, fraudulent misrepresentation, fraudulent inducement and fraudulent concealment have identical elements, which are: (1) false statement of material fact or suppression of truth by the defendant; (2) the defendant knew or should have known the statement was false, or made the statement without knowledge as to truth or falsity; (3) the defendant intended the

---

**25.** As was noted above and in the court's previous orders, Grills is also expected to comply with Federal Rule of Civil Procedure 8 and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) in order to survive a Rule 12(b)(6) motion to dismiss. However, fraud was not at issue in *Twombly*. *See Twombly*, 550 U.S. at 576 n. 3, 127 S.Ct. 1955 (Stevens J., dissenting) ("The Federal Rules do impose a 'particularity' requirement on 'all averments of fraud or mistake,' neither of which has been alleged in this case." (citation omitted)). Rather, Rule 9(b) involves pleading requirements that are at least as, if not more, stringent than Rule 8, as applied in light of *Twombly*. It follows that this Circuit's pre-*Twombly* analysis of Rule 9(b) continues to apply here. *See Whitehurst*, 306 Fed.Appx. at 449; *Barrett*, 281 Fed.

Appx. at 954–955; *see also Shandorf v. MCZ/Centrum Fla. XIX, LLC*, No. 08–61314–CIV–COHN–SELTZER, 2009 WL 1024636, at *1–3, 2009 U.S. Dist. LEXIS 34316, at *1–9 (S.D.Fla. Apr. 15, 2009); *Bivens v. Roberts*, No. 208CV026, 2009 WL 891859, at *5, 2009 U.S. Dist. LEXIS 27725, at *17–18 (S.D.Ga. Mar. 31, 2009) (increased level of specificity for fraud over and above *Twombly* requirements); *Bates v. Milano*, No. 2:08–cv–320–FtM–29DNF, 2009 WL 1607774, at *1, 2009 U.S. Dist. LEXIS 48029, at *2–3 (M.D. Fla. June 9, 2009) (same); *United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06–cv–571–T–33TBM, 2009 WL 1424213, at *3–6, 2009 U.S. Dist. LEXIS 45809, at *8–18 (M.D.Fla. May 20, 2009). The court therefore focuses on Grille's compliance with Rule 9(b).

false statement or omission induce the plaintiff's reliance; and (4) the plaintiff justifiably relied to his detriment. *See Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1240 n. 13 (11th Cir.2009); *Roberts v. Rayonier, Inc.*, 135 Fed.Appx. 351, 362 n. 8 (11th Cir.2005) (per curiam) (quoting *Butterworth v. Quick & Reilly, Inc.*, 998 F.Supp. 1404, 1410 (M.D.Fla.1998)); *Michaud v. Seidler*, No. 08–80288–CIV–RYS-KAMP/VITUNAC, 2008 WL 4927015, at *2, 2008 U.S. Dist. LEXIS 95945, at *4–5 (S.D.Fla. Nov. 17, 2008) (quoting *Webb v. Kirkland*, 899 So.2d 344, 346 (Fla. Dist. Ct. App. 2005)); *Livingston v. H.I. Family Suites, Inc.*, No. 6:05–cv–860–Orl–19KRS, 2006 WL 1406587, at *7, 2006 U.S. Dist. LEXIS 31895, at *20–21 (M.D.Fla. May 22, 2006) (citing *Albertson v. Richardson–Merrell, Inc.*, 441 So.2d 1146, 1149–50 (Fla. Dist.Ct.App.1983) (per curiam)); *Mickens v. Tenth Judicial Circuit*, 181 Fed.Appx. 865, 876–77 (11th Cir.2006) (per curiam) (citing *Simon v. Celebration Co.*, 883 So.2d 826, 832 (Fla.Dist.Ct.App.2004)).

The issue before the court, therefore, is whether any or all of Grills's four allegations are stated with sufficiency when tested by Rule 9(b)'s requirements. The court will address each allegation in turn.

## A. Fraud with Respect to Marketing to Children

 Grills alleges that Defendants engaged in "deceptive marketing" techniques targeting toward children in order to obtain "replacement" consumers for those either quitting smoking or dying of smoking-related diseases. Grills further maintains that Defendants affirmatively misrepresented or purposefully concealed

from the public this marketing strategy. In support of these allegations, in addition to vague references to unspecified research and unidentified "secret" or "internal" documents, Grills provides the following specific facts to the court:

- In 1969, the Chairman of the Tobacco Institute ("TI")[26] testified before a Senate subcommittee: "It is the intention of the cigarette manufacturers to avoid advertising directed to young person[s] ... to avoid advertising which represents that cigarette smoking is essential to social prominence, success, or sexual attraction; and to refrain from depicting smokers engaged in sports or other activities requiring stamina or a conditioning beyond those required in normal recreation." Pl.'s Second Am. Compl. ¶ 49;

- In 1983, TI published the pamphlet "Voluntary Initiatives of a Responsible Industry"; Grills alleges that "the pamphlet noted that in 1964, the industry knowledge that sales to children were illegal, that children would not appreciate the dangers of the product or its addictiveness, that most of the children who began to smoke would become addicted, and that a significant percentage would develop smoking-related diseases or suffer premature death as a result. [sic] They denied doing so with full knowledge that such denials were false and misleading." *Id.* ¶ 50 (quotation mark omitted);

- R.J. Reynolds developed the Joe Camel cartoon advertising campaign, which the company, in 1988, targeted to children through mass dissemination of products in matchbooks, signs clothing, mugs and drink can holders. *Id.* ¶ 45;

---

**26.** According to Grills' complaint, Defendants, in 1958, created TI—a public relations organization "whose function was to make certain that defendants' false and misleading positions on issues ... were kept constantly before the public, doctors, the press, and the government"—which acted as Defendants' agent because Defendants effectively "controlled" TI. Pl.'s Second Am. Compl. ¶ 27.

- A series of 1984 R.J. Reynolds advertisements claimed that "We don't advertise to children." *Id.* ¶ 46;
- In 1991, in order "[t]o avoid full disclosure" about Joe Camel ads during a Federal Trade Commission investigation, R.J. Reynolds "instructed its advertising agency to destroy documents in the agency's possession" relating to the Joe Camel campaign. *Id.* ¶ 47.

Grills's complaint further contains allegations that the "Cigarette Companies"[27] have and continue to glamorize smoking in their advertisements as a rite of passage or status symbol; advertise in stores near high schools; promote brands heavily during spring and summer breaks; hand out gratis cigarettes where young people congregate; pay movie producers for product placement in films with large youth audiences; place advertisement in magazines read by young people; and sponsor sporting and other events appealing to youths. *Id.* ¶ 44.

These factual allegations fail to meet Rule 9(b)'s requirements in at least three respects. First, Grills may only recover for his injuries pursuant to his smoking habit insofar as Defendants' actions in marketing to children fraudulently misled or induced him to smoke.[28] Therefore, Grills must present to the court "the content of [the fraudulent] statements [or omissions] and the manner in which they misled" him. *Ziemba*, 256 F.3d at 1202.

But Grills began smoking in 1977, as an 18-year-Old; accordingly, the Defendants' post-1977 actions lack the requisite causation to be relevant in Grills's case, absent further; explanation as to their particular relevance *with regards to Grills himself.*

Second, the Defendants' actions, in 1977 and before, must be described with particularity; Grills's complaint must explain to the court "precisely what statements were made in what documents or oral representations or what omissions were made" and "the time and place of each such statement and person responsible for making (or, in the case of omissions, not making) same." *Ziemba*, 256 F.3d at 1202. The only pre-1977 action of Defendants explained with particularity is the 1969 testimony of the TI Chairman. Grills does not, however, explain how this statement "misled" him in any way nor does he describe to the court what effect at all, if any, this omission had upon him in his decision to begin smoking Defendants' products.

Third, Grills' general statements regarding actions by the "Cigarette Companies" are not accompanied with any specifics identifying which companies have used which practices and when the practices were utilized.

### B. Fraud with Respect to Cigarettes' Health Hazards

■ Grills's allegations concerning Defendants' fraudulent misrepresentation and

---

**27.** Grills does not identify which companies comprise the "Cigarette Companies" in his complaint.

**28.** Grills's complaint alleges:

By means of the wrongful course of conduct targeted broadly at a broad portion of the public ... defendants intended to induce and did induce plaintiff, while he was under age to purchase defendants' harmful and addictive products.

Plaintiff ... began smoking the defendant's Marlboro, Marlboro Light[s] and Doral Cigarette products beginning from the year of 1977 when he entered the United States Army and was subject to the defendants' illegal and fraudulent marketing techniques, until the present, where his addiction to those products continues.

Plaintiff currently smokes and has an addiction to Marlboro Light[s] cigarettes which ha[ve] also been marketed illegally to the general public by the defendants.

Pl.'s Second Am. Compl. ¶¶ 57–59.

concealment of the health effects of cigarettes also run afoul of Rule 9. The complaint charges Defendants with the knowing misrepresentation or concealment of the health hazards of cigarette smoking. Grills identifies public Statements that these organizations were researching the health risks of cigarettes, but does not elaborate thereon.[29] The complaint also contains only general statements that Defendants were aware of the negative health effects of cigarettes. *See* Pl.'s Second Am. Compl. ¶¶ 18 ("In the 1940's and early 1950's, scientific researchers published findings that indicated a relationship between cigarette smoking and diseases, including lung cancer."), 19 ("Senior Cigarette Company executives and researchers closely monitored such research and knew that if the public came to understand that cigarette smoking causes cancer and other diseases, the Cigarette Companies' profits would decline and the industry would face the prospect of civil liability and government regulation.").

Grills's complaint asserts the existence of a conspiracy or "enterprise" to effect a "concerted public relations campaign intended to preserve [Defendants'] products" birthed in a December 15, 1953 meeting in New York City at the Plaza Hotel,[30] *id.* ¶ 20, but does not inform the court of explicit acts of Defendants performed in furtherance of the conspiracy.

---

**29.** The Tobacco Industry Research Committee ("TIRC") was formed by cigarette companies, which Grills alleges include Defendants. Pl.'s Second Am. Compl. ¶ 25. According to Grills's complaint, in January 4, 1953, TIRC ran an advertisement in newspapers titled "A Frank Statement to Cigarette Smokers" which stated:

> We are pledging aid and assistance to the research effort into all phases of tobacco use and health....
> In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

*Id.* No more information about this "Board" or the TIRC, or what these entities did or what happened with this research is mentioned in the complaint.

**30.** The complaint states that, at the behest of the president of American Tobacco Co., Philip Morris USA, R.J. Reynolds and other tobacco companies met on December 15, 1953 in order to formulate "an industry response" to published research linking cigarettes and disease. The complaint alleges:

> At that meeting, these chief executives agreed that the published studies were "extremely serious" and "worthy of drastic action".... [T]he chief executives determined to respond to this serious public health issue with a concerted public relations campaign intended to preserve their profits .... The chief executives ... agreed that the strategy they were implementing was a "long-term one" that required defendants to act in concert with each other on the current health controversy, as well as on issues that would face them in the future. This Enterprise and conspiracy still continues today.
> The fundamental goal of the Enterprise and conspiracy was to preserve and expand the market for cigarettes and to maximize the Cigarette Companies' profits. To achieve this goal, defendants' strategy was to respond to scientific evidence of the adverse health consequences of cigarette smoking—including issues regarding nicotine addiction—with fraud and deception. Rather than provide full disclosure to the public and in congressional, federal agency, and judicial proceedings about what they knew or learned about the dangers of cigarette smoking, defendants and their agents determined, in furtherance of this Enterprise and conspiracy, to deny that smoking caused disease or that nicotine was addictive, despite having actual knowledge to the contrary.

Pl.'s Second Am. Compl. ¶¶ 19–22.

In fact, the complaint provides no *specific* instances of misrepresentation by Defendants regarding health risks, as Grills maintains that he cannot obtain such information because it is the "exclusive knowledge of defendants."[31] While "pleading requirements of Rule 9(b) may be relaxed when the facts relating to fraud are 'peculiarly within the perpetrator's knowledge,'" *Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 Fed.Appx. 893, 897 (11th Cir.2008) (per curiam) (quoting *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2003)), "conclusory statements are insufficient to justify relaxation." *Id.* (citing *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n. 25 (11th Cir.2002)). As explained in *Clausen*, Grills "is not without avenues for obtaining information" such as the public documents he references, e.g., advertisements, press-releases, statements to government entities in public hearings and so forth. *Clausen*, 290 F.3d at 1314 n. 25.

Furthermore, Grills's statement that these public documents are in the "exclusive knowledge Of the defendants" does not address a required element of his fraud claim, namely, that he relied on and was misled by the alleged public statements or omissions to his detriment. Rather, Grills's complaint fails to explain how Defendants misled him in particular. He provides no information to the court as to his own knowledge about the health effects of smoking and does not describe his reliance on the alleged misrepresentations and concealments of Defendants.

## C. Fraud with Respect to Addictiveness of Nicotine

■ Grills builds a stronger case for his allegations that Defendants fraudulently misrepresented or concealed the addictiveness of nicotine. His complaint provides the court with information as to Defendants' knowledge of the addictiveness of nicotine[32] and cites particular fraudulent misrepresentations and concealments:

- "A 1977 Philip Morris study on the withdrawal effects of nicotine was permitted to proceed only if results were what the Cigarette Companies wanted. If not, as a Philip Morris researcher explained, 'we will want to bury it.'" Pl.'s Second Am. Compl. ¶ 32.

- A March 1980 internal memorandum, produced by "a Philip Morris scientist" which discussed "company research into the psychopharmacology of nicotine"; the research was "aimed at understanding that specific action of nicotine which causes the smoker to repeatedly introduce nicotine into his body." The memorandum noted that this was a "highly vexatious topic" that "company lawyers did not want to become public because nicotine's drug properties, if known, would support regulation of tobacco by the federal Food and Drug Administration." The memorandum thus observed

---

**31.** "Defendants and their co-conspirators committed hundreds, and perhaps thousands, of act[s] involving material fraudulent misrepresentations, fraudulent concealment, and fraudulent non-disclosures over the course of the last forty-five year[s]. Defendants' and their co-conspirators' acts of concealment took a number of forms, many of which are unknown to Plaintiff because such actions and concealment are within the exclusive knowledge of defendants. Plaintiff [is] unable to allege in full the numerous advertisements, press releases, and other communications that defendants and their co-conspirators released over the past forty-five years because plaintiff did not have access to this information." Pl.'s Second Am. Compl. ¶ 55.

**32.** *See infra* note 21. Grills further offers a general statement that Defendants "understood nicotine's addictive properties since the early 1960s at the latest." Pl.'s Second Am. Compl. ¶ 31.

that "[o]ur attorneys ... will likely continue to insist on a clandestine effort in order to keep nicotine the drug in low profile." *Id.*

- "In the early 1980's, Philip Morris hired Victor DeNoble and Paul Mete to study the effects of nicotine on the behavior of rats and to research and test potential nicotine analogues. DeNoble and Mele's research demonstrated that nicotine was addictive and that in terms of addictiveness, 'nicotine looked like heroin.' In August 1983, Philip Morris ordered DeNoble to withdraw a research paper on nicotine that had already been accepted for publication .... Less than a year later, Philip Morris abruptly closed DeNoble's nicotine research lab. Philip Morris executives threatened DeNoble and Mele with legal action if they published or talked about their nicotine research. The animals were killed, the equipment was removed, and all traces of the former lab were eliminated." *Id.*
- TI attacked the Surgeon General's 1988 report (concluding, based on non-industry research, that nicotine was addictive) saying that "claims that cigarettes are addictive contradict common sense.... The claim that cigarette smoking causes physical dependence is simply an unproven attempt to find some way to differentiate smoking from other behaviors." *Id.* ¶ 33.
- "On or about January 12, 1999, Philip Morris entered into an agreement with Liggett to purchase certain brands of cigarettes previously manufactured by Liggett ... each of which, at the time of their sale to Philip Morris, contained the warning concerning the addictiveness of smoking. After it purchased these brands, Philip Morris altered the packaging ... to eliminate the warning concerning addictiveness." *Id.* ¶ 34.

These misrepresentations are significant because, Grills argues, nicotine renders the smoker unable to quit once addicted to cigarettes. Grills provides statistical information to this effect. *See id.* ¶¶ 15, 16, 17, 35.

Grills's complaint further asserts that he became addicted and is still addicted to nicotine found in Defendants' cigarettes. *See id.* ¶¶ 58–59. The fact of Grills's addiction, however, does not completely fulfill his Rule 9(b) obligation to inform the court, with particularity, how Defendants misled him.

Grills alleges that

the average consumer has not been fully aware of the addictive properties of nicotine, and most beginning smokers—particularly children and young adults—either were unaware of the addictiveness of nicotine or falsely believe that they will be able to quit after smoking for a few years and thereby avoid the diseases caused by smoking ....

*Id.* ¶ 30. However, Grills provides no information or facts regarding his own state of mind or his own knowledge of the addictiveness of nicotine. Furthermore, he does not describe how Defendants' misrepresentations and concealment of research on nicotine affected his smoking. Grills's cited events—in or before 1977, when he began smoking—include only a commencement of research into nicotine's addictiveness with an intent to cover up the results; thus, as Grills has presented the facts to the court, the actual fraudulent misrepresentation of concealment of this research took place after Grills began smoking. As to post–1977 events, Grills has not explained to the court how these events misled him or caused his damages, especially in light of his contention that nicotine in cigarettes makes it nearly impossible to quit smoking, regardless of the information available to the smoker on the health effects and addictiveness of cigarettes. Indeed, Grills claims to be still addicted to

cigarettes, and thus unable to quit smoking, despite his knowledge of the aforementioned facts.

### D. Fraud with Respect to Manipulation of Nicotine Levels

■ Grills's Second Amended Complaint also fails to plead with particularity Grills's claims that Defendants fraudulently manipulated nicotine levels in their products. Grills presents the court with some evidence that Defendants knew about the addictiveness of nicotine and were investigating methods to manipulate nicotine in their products.[33] Grills also identifies for the court specific instances in which Defendant R.J. Reynolds denied publicly that they manipulate nicotine levels.[34] However, the remaining information Grills provides contains only vague allegations of secret documents and/or statements and/or actions by cigarette companies not parties to this litigation (e.g., American Tobacco Co., Lorillard, Brown & Williamson, British American Tobacco). Grills alleges that "the Cigarette Companies":

- use "highly sophisticated technologies designed to deliver nicotine in precisely calculated ways that are more than sufficient to create and sustain addiction";
- use "selective breeding and cultivation of plants for nicotine content and careful tobacco leaf purchasing and blending plants, and control nicotine delivery (i.e., the amount absorbed by the smoker) with various design and manufacturing techniques"; and
- use "other additives, ingredients, and techniques" to "increase the potency, absorption or effect of nicotine"

Pl.'s Second Am. Compl. ¶¶ 36–37. But, as with other parts of his complaint, Grills *does not identify who* the "Cigarette Companies" are, nor does he explain which of the Defendants practice which manipulation techniques.

Missing from Grills's complaint are any *specific* allegations of nicotine manipulation as to the particular Defendants before the court. Rule 9(b) does not permit Grills to rely on such general assertions leveled at unidentified defendants. Nor

---

**33.** In this regard, Grills alleges, among other things, that:

Philip Morris internally discussed methods for increasing the nicotine content of cigarettes as early as 1960. . . . [R.J.] Reynolds, understanding the importance of retaining sufficient nicotine to maintain dependence on its so-called "low tar/low nicotine" cigarettes, internally proposed in 1971 that the company undertake research into determining more exactly the "habituating level of nicotine." . . .

[A]s explained in an internal 1973 [R.J.] Reynolds document: . . . Methods which may be used to increase smoke pH and/or nicotine "kick" include; (1) increasing the amount of (strong) burley in the bl[e]nd, (2) reduction of casing sugar used on the burley and/or blend, (3) use of alkaline additives, usually ammonia compounds, to the blend, (4) addition of nicotine to the blend, (5) removal of acids from the blend, (6) special filter systems to remove acids from or add alkaline materials to the smoke, and

(7) use of high air dilution filter systems. Methods 1–3, in combination, represent the Philip Morris approach, and are under active investigation [by R.J. Reynolds].

Pl.'s Second Am. Compl. ¶¶ 31, 36. Grills does not identify the above-mentioned "internal" discussions, research or documents by name, specific date, or author or provide other identifying information.

**34.** According to Grills's complaint, R.J. Reynolds, in a 1994 advertisement appearing after the Health Subcommittee hearings, stated

We do not increase the level of nicotine in our four products in order to addict smokers. Instead of increasing the nicotine levels in our products, we have in fact worked hard to decrease "tar" and nicotine

. . . .

and touted its use of "various techniques that help us reduce the 'tar' (and consequently the nicotine) yields of or products." Pl.'s second Am. Compl. ¶ 40 (emphasis omitted).

does Grills provide any explanation as to how Defendants' supposed manipulation and Defendants' misrepresentation of this manipulation affected Grills himself as a smoker. Again, Grills must provide information as to his own state of mind and inform the court as to "the manner in which [the alleged misrepresentations] misled" him. *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001).

### E. Leave to Amend in Order to Comply with Rule 9

 As with the amendments for jurisdictional defects discussed above, leave to amend here should be granted "when justice so requires." Fed.R.Civ.P. 15(a)(2). "Ordinarily, if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, leave to amend should be freely given." *Hall v. United Ins. Co. of Am.,* 367 F.3d 1255, 1262 (11th Cir.2004) (citations and quotation marks omitted); *see also Bell v. Fla. Highway Patrol,* 325 Fed.Appx. 758, 760 (11th Cir.2009) (per curiam); *Friedlander v. Nims,* 755 F.2d 810, 813 (11th Cir.1985) (A "district court should give a plaintiff an opportunity to amend his complaint rather than dismiss it when it appears that a more carefully drafted complaint might state a claim."). However, the court need not "allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree,* 252 F.3d 1161, 1163 (11th Cir.2001) (per curiam) (citation omitted); *see also Whitehurst v. Wal–Mart,* 306 Fed.Appx. 446, 449 n. 5 (11th Cir.2008) (per curiam) (collecting cases).

 As we have explained above, Grills's has failed twice to cure deficiencies by amending his complaint. Nothing in the record, however, suggests bad faith or motive. In addition, as a consequence of the court's consideration of the preemption issue, it is not possible to conclude today that Grille's complaint cannot be saved by truthful amendment such that further amendment would be futile. Rather, it is possible that if pled with particularity, Grills's allegations could be "a proper subject of relief." *Hall v. United Ins. Co. of Am.,* 367 F.3d 1255, 1262 (11th Cir.2004) (citations and quotation marks omitted). Finally, the court notes that Grills's Second Amended Complaint addressed some of the deficiencies identified by prior Court orders.

Accordingly, it is appropriate to permit Grills one last and final opportunity to amend his complaint. However, should Grills further amend his complaint, and should such an amended complaint, as filed with the court, also fail to adequately allege a jurisdictional basis and otherwise satisfy the Federal Rules of Civil Procedure, the court's view on this point will undoubtedly change. *See id.; Osahar v. U.S. Postal Serv.,* 297 Fed.Appx. 863, 864 (11th Cir.2008) (per curiam) ("Osahar attempted to amend his complaint five times. Before the last amendment, the district court warned Osahar that his failure to satisfy Rule 8(a)(2) would result in a dismissal. Osahar did not comply and failed repeatedly to state a claim upon which relief could be granted. It would have been futile to allow Osahar to amend his complaint yet again.").

### *CONCLUSION*

In sum, Grills has failed to (1) allege diversity jurisdiction including specifically his failure to allege his own citizenship in the state of Florida and (2) sufficiently plead fraud with particularity, as required by Fed.R.Civ.P. 9(b), although, as ex-

plained above, the majority of Grills's fraudulent concealment claim, if properly plead, could survive preemption.[35]

The court therefore

- DISMISSES plaintiff's Second Amended Complaint, pursuant to Fed.R.Civ.P. 12(h)(3), without prejudice, for failure to comply with Fed.R.Civ.P. 8(a); and
- GRANTS Plaintiff one last opportunity to amend and address the above-mentioned deficiencies in Plaintiff's Second Amended Complaint. If Plaintiff's complaint is not so amended within seventy-five (75) calendar days of this order, i.e., by October 19, 2009, this dismissal shall be with prejudice.

Judgment will issue accordingly.

---

**35.** On July 21, Defendant Philip Morris USA additionally filed a Motion to Suspend Case Management and Scheduling Order and to Stay All Proceedings Pending Court's Ruling on Motion to Dismiss, The court's disposition moots this motion.